**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-------------------------------------------------------X**
                                              :
**UNITED STATES OF AMERICA,**      :        19 CR 166 (VEC)
                                              :
      **-v-**                                :
                                              :
**COREY CRAY**                            :
                                              :
           **Defendant.**          :
**-------------------------------------------------------X**

## SENTENCING MEMORANDUM

Submitted by:
Xavier R. Donaldson
Attorney for Corey Cray
1825 Park Avenue, Suite 1102
New York, NY 10035
212-722-4900
xdonaldson@aol.com

# Donaldson & Chilliest, LLP
## 1825 Park Avenue, Suite 1102
### New York, NY 10035
### 212-722-4900
### 212-722-4966

September 22, 2021

**VIA ECF and Email**
Honorable Valerie E. Caproni
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Corey Cray*
                 19 Cr 007 (VEC)

Dear Judge Caproni:

Please accept this letter on behalf of Mr. Cray regarding his sentencing to be held on October 12, 2021.

**ANALYSIS OF 18 USC 3553 FACTORS**

18 USC Section 3553 calls upon this Court to consider specific factors, including the appropriate Sentencing Range, to impose a sentence on a defendant that is "sufficient but not greater than necessary" to comply with the goals of sentencing. *See, 18 USC Section 3553(a)*. Indeed, any sentence imposed by the Court must be based upon an individualized assessment based upon the unique factors presented. *See*, *U.S. v. Gall*, 552 US 38, 39 (2007).

Significantly, the United States Sentencing Guidelines merely reflect a "rough approximation of sentences that might achieve section 3553(a)'s objectives". *See*, *Rita v. United States* 551 US 338, 350 (2007). The Court "may not assume that the Guidelines Range is reasonable." *Gall,* at 50. As the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id*., at 351 (emphasis in original).

After giving both parties an opportunity to argue for whatever sentence they deem appropriate, the District Court should then consider all of the 3553(a) factors to determine whether they support the sentence requested by a party". *U.S. v. Gall*, at 49-50. It is our

opinion that after considering all the factors articulated in 18 USC 3553, this Court should sentence Mr. Cray to an incarceratory term of **60 months** concurrent with his State sentence which is "sufficient but not greater than necessary" for Mr. Cray's participation in this criminal conduct.

(1)   NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY OF AND CHARACTERISTICS OF THE DEFENDANT

**Nature and circumstances of the offense**

Mr. Cray was arrested related to this matter on October 28, 2019. As the Court is aware, on June 15, 2021, Mr. Cray pleaded guilty to the lesser included offense of Count 1—Attempted Murder in Aid of Racketeering, in violation of 18 USC Section 1959(a)(5). Specifically, on February 8, 2019, Mr. Cray participated in an Attempted Murder related to or in furtherance of his membership in the Jack Boys. Mr. Cray fully accepted his responsibility and is completely remorseful for his participation. We note, and without minimizing the severity of the charge, that Mr. Cray was not the triggerman in this Attempted Murder and did not provide the firearm used in this Attempted Murder.

**Characteristics of the Defendant**

Mr. Cray was born on October 15, 1993 in Killeen, Texas to Anson Cray, Sr. and Dealva Faulk. Mr. Cray has two (2) siblings: Anson Cray, Jr., age 31, who lives in Bronx, NY, and works as a taxi driver; and Lurenea Cray, age 22. Mr. Cray's mother still resides in the Bronx and is employed in a local school assisting teachers and parents meet and discuss any issues related to the students.

Unfortunately, Mr. Cray has not seen his father since he was approximately seven (7) years old and indicates that this did play a significant role on him as he was growing up and his father's presence may have spared him the significant verbal, psychological and physical abuse he suffered as a child from his maternal grandfather. Importantly, Mr. Cray's grandfather specifically chose Mr. Cray, among the other siblings, to beat, use severe profanity and withhold food resulting in Mr. Cray feeling depressed, isolated and alone. It is no wonder that, during this abuse from his grandfather, Mr. Cray was referred by his school to a specialist due to behavioral problems: he was likely responding to the severe abuse he was receiving at home from his grandfather. As a result of the school's recommendation, Mr. Cray attended weekly individual counseling and was prescribed Ritalin. We would note that this conduct responsive conduct as a result of his grandfather's abuse is likely the seeds that grew into anti-social behavior that evolved into criminality.

After suffering severe abuse from his grandfather, Mr. Cray moved into his maternal grandmother's home. Mr. Cray's grandmother is partially blind and therefore requires the assistance of Mr. Cray. To that end, Mr. Cray did all the grocery shopping, filled all of her prescriptions, kept the house clean, took care of all of his grandmother's errands and made sure to walk her Yorkshire Terrier.

At the age of 14, Mr. Cray began using Marijuana and has been smoking marijuana *every day* that he could until he was arrested on this matter. That means that since he was 14 years old, he has been suffering from untreated child abuse and smoking marijuana every single day. Every day since 14 he has been high and suffering from child abuse. We are strongly suggesting that this Court urge the BOP to provide Mr. Cray the necessary treatment to resolve the issues that may be at the core of his conduct.

Even though Mr. Cray was referred by his middle school to experts due to behavioral problems, he still matriculated and graduated to high school. His antisocial behavior as a youth was never properly treated. Unfortunately, as stated earlier, he began smoking marijuana immediately upon entering high school. As indicated by his prior criminal history, and in no way a coincidence, his first arrest was at the age of fourteen (14). Like other kids in the Bronx, Mr. Cray was a formerly abused child, now high on marijuana and subjected to the continuous temptations of street psychiatrists acting as if they are his missing father. The result: Grand Larceny at the age of 14 and sentenced to placement. In other words, the cobblestones to this Courthouse began at the hands of his Grandfather, the marijuana from the corners and the unapologetic, unrepentant pulls from "peers".

After that initial arrest, Mr. Cray was never "cured" from the Streets. Mr. Cray literally spent the next several years in and out of prison without ever getting the opportunity to remove himself from the environment that initially brought him into criminal conduct. A sentence of five (5) years and supervision will accomplish that. Why? Because thereafter, Mr. Cray intends to leave New York City and move into a home with his uncle in North Carolina. There, we believe, Mr. Cray will be able to find employment, stay away from those that can pressure him to associate with criminal behavior, receive treatment for his trauma/abuse and basically heal.

**Afford adequate deterrence to criminal conduct**

Mr. Cray has been incarcerated related to this matter since December of 2019. During that time, Mr. Cray has served over eighty (80) days in the Special Housing Unit (SHU) of the Metropolitan Detention Center without receiving a disciplinary ticket. In other words, while at MCC, Mr. Cray has spent over 80 days in isolation in what has been characterized as one of the worst jails in the BOP without being convicted of a BOP charge. These 84 days likely felt like 168 days or in other words double time: no socialization, no visitation, no proper supplies, horrible ventilation, vermin, roaches and feces.

As stated above and based upon information and belief, Mr. Cray has not committed any serious infractions since he has been incarcerated related to this federal matter. To be clear, Mr. Cray has not engaged in any violent activity, did not participate in any unlawful use of narcotics since his arrest related to this case and based upon

information and belief was not in possession of any illegal cellular cell phones while incarcerated.[1]

As indicated above, Mr. Cray has completely accepted his responsibility related to this matter and understands the seriousness of his criminal conduct. Moreover, like many other similarly situated individuals, Mr. Cray faces significant collateral consequences as a result of this federal felony conviction. Indeed, because of this federal conviction, Mr. Cray will not be able to obtain certain state or federal licenses, he will forever be labeled a federal felon, he will be denied significant employment opportunities making upward mobility significantly more challenging, he may be denied certain federal governmental benefits, he may be denied certain home loans or other economically advantageous avenues as well as denial of certain housing opportunities.

We do not disagree that the prosecution of gangs and violence associated therein is very important. We do, however, disagree on the punishment that the Government and the probation department are recommending. In this particular case, we believe that three questions should be asked: First, "what amount of incarceration, if any, would serve to deter Mr. Cray from future criminal conduct because of his conviction in this matter?" Notably, there is absolutely no statistical evidence that longer sentences equal more deterrence. Moreover, in this case, even though Mr. Cray has several prior convictions, he has never served more than 3.5 years in jail/prison. He definitely has never served time in a federal facility under solitary like conditions. Thus, a sentence of 60 months is considerably longer than any sentence he has ever had and absolutely will (and already has) serve as a deterrent. Any sentence over 60 months will not guarantee specific deterrence any more than a sentence of 60 months will.

The second question is "what amount of incarceration would serve as a protective measure for society?" We would argue that five (5) years away from society is sufficient to protect society from any possible criminal conduct from Mr. Cray. Anything more than 5 years would simply amount to a random number speculating that said number is sufficient. Sixty (60) months inside of a jail cell is more than sufficient to protect society and punish Mr. Cray for his admitted criminal conduct. Again, we completely disagree with the Probation Department's recommendation. As stated earlier, Mr. Cray did not actually shoot at anyone.[2] Additionally, Mr. Cray did not give the shooter the firearm that was used in the shooting that is the primary subject of this conviction.

Finally, "what amount of incarceration is appropriate for Mr. Cray's *actual conduct* that is the subject of this conviction?" In other words, what is the appropriate conduct for Mr. Cray being a member of a gang and acting as a *lookout* for a fellow gang

---

[1] And for the first time in over a decade, he is drug free and speaking and thinking with a clear mind.

[2] Again, we note that Mr. Cray's participation in this crime is extremely serious. But there clearly is a difference between the "shooter" and the "lookout". Both are guilty of the crime but we would argue that the "shooter" is clearly more culpable as it requires a different type of commitment to actually hold, point and pull the trigger.

member who attempts to shoot at an opposing gang member after said opposing gang member killed a member of his gang and Mr. Cray has no other acts of violence related to this conspiracy.[3] In our opinion, notwithstanding Mr. Cray's criminal record, 120 months is wholly inappropriate for Mr. Cray's conduct in this case.

While we anticipate the Government's argument that Mr. Cray was a member of a violent conspiracy, we argue that 60 months is still sufficient punishment. Clearly, Mr. Cray's admitted acts require punishment, but we argue that this conduct is not of such a nature that require more than five (5) years in a federal prison.  Five (5) years in a federal prison, post release supervision, drug and mental health treatment and the lifelong stigma of being a convicted federal felon is sufficient deterrence to Mr. Cray or any similarly situated person. Ten years of incarceration, however, does not serve any legitimate purpose.

Finally, as we will discuss later, we believe that being incarcerated for over 19 months in almost continual SHU like conditions, along with the deprivation of family contact is sufficient to deter any one from committing this type of conduct. Today, Mr. Cray has a much clearer head than when he was arrested in December of 2019.

**Protect the public from further crimes of the defendant**

Rehabilitation begins after a person is incarcerated related to criminal activity.  In this case, while in BOP custody at MCC, Mr. Cray has not received any tickets. While we agree that persons arrested and incarcerated pending trial are supposed to follow the rules of the facility, his restraint from anti-social behavior at MCC is notable because it was done under objectively harsh and incredibly stressful conditions. This is a clear indication that Mr. Cray has turned a corner and is more likely than not going to refrain from future criminal conduct. Reality is often times much different than idealism and the reality is that staying out of trouble "when all about you are losing theirs" is incredibly difficult.

We believe that after the significant, cruel and unusual detention during the Gun and COVID lockdowns, time away from his family, a proper drug treatment program, appropriate psychiatric treatment and federal supervision, Mr. Cray will be a very low risk of recidivist behavior.

**Provide defendant with needed educational, vocational, medical care or other treatment**

As previously indicated, Mr. Cray did not complete high school. But, while incarcerated on State charges, he did obtain his GED and other vocational certificates. Like many others, Mr. Cray was a young boy that got "caught up" in the web of truancy, criminal association and drug use that caused him to be before this Court for sentencing.

---

[3] PSR, paragraph 41.

The silver lining, however, is that Mr. Cray will have significant and concrete family support upon his exit from prison. Of course, the Government will argue that this "family presence" was there before Mr. Cray got arrested and why would one believe anything will be different. This, however, is not a strong argument. Time heals all wounds. If we accept the government's anticipated argument, then there is no timetable when Mr. Cray's family, or anything else, will be considered a buffer for future criminal conduct.

Because of Mr. Cray's prior drug, psychiatric and narcotic history, we are strongly suggesting that the Court urge the Bureau of Prisons to allow Mr. Cray to take advantage of and participate in any vocational or educational courses that would allow him to increase the possibilities of a successful re-entry into society upon his release. Additionally, as the Court is aware, Mr. Cray had been using drugs for several years prior to his arrest in this case. Consequently, we are asking the Court to strongly recommend that Mr. Cray be allowed to participate in any and all available Drug Treatment programs including RDAP and that Mr. Cray be housed in a facility as close to New York City as possible to facilitate familial visitation and support.

## **BELOW GUIDELINES SENTENCE DUE TO "GUN LOCKDOWN" AND COVID-19**

As the Court is aware, Mr. Cray was arrested in December of 2019. Prior to that arrest, Mr. Cray spoke to either his mother or grandmother every day. Even though he was admittedly involved in criminal activity while he was not incarcerated, Mr. Cray was very close to his family. After he was detained pursuant to this case in December of 2019, his close contact with his family continued and on information and belief, Mr. Cray spoke to or tried to speak to his family almost every day after his arrest. In fact, the close contact Mr. Cray had with his family is what helped him thru the lonely days and harsh nights while in BOP custody. Prison is supposed to be punishment but humane. In the months between December 2019 and March 2020 even though incarcerated, Mr. Cray at least felt like a human being because he was able to see and/or speak to his family members.

In March of 2020, COVID-19 arrived with a vengeance. There can be no doubt that March 2020, the month COVID-19 became a reality in this Country, forever changed incarceration for defendants in the United States. The measures necessary to slow the progress of the disease – social distance, masks, adequate hygiene – were and still are impossible inside a prison. Crowded into small areas, communal dining, sleeping in close quarters, toilets shared by dozens of inmates, phones passed from one inmate to another, shared computers, no sanitizing wipes, limited soap and cleaning products are rampant in prisons across the United States. Due to COVID-19, jail conditions which are objectively harsh anyway, became even more harsh. MCC was not spared.

During this COVID-19 pandemic, Mr. Cray experienced several lock downs, limited attorney visits, no family visits, limited showers and often times no clean clothes.

Moreover, the complete and daily anxiety that Mr. Cray experienced while being locked in a "petri dish" type environment is unimaginable. The public were able to stay home, social distance, change their masks, choose what toilet to use, wash their hands as much as possible and to avoid people.  Mr. Cray was unable to do any of that.  Most importantly, since February/March 2020 (or a tad bit earlier), Mr. Cray has been unable to *see or touch* any of his family members.  To be clear, for several months at a time, in the most humane and just country on earth, Mr. Cray was not able to speak to or see his family.  This circumstance, a sharp departure from Mr. Cray's former daily routine, made Mr. Cray's incarceration absolutely excruciating.

Mr. Cray was served cold or rotten food, slept in unsanitary cell conditions, observed rodents and bugs on a daily basis, was unable to shower for days and sometimes weeks at a time, was unable to purchase supplies from the commissary and literally felt like he contracted COVID on several occasions. This combined with the fact that Mr. Cray suffered extreme abuse as a child made his 19 months in custody cruel and unusual punishment. As such, we wholeheartedly agree with Judge Oetken's assessment in ***United State v. Daniel Gonzalez, 18 Cr. 669, (JPO), 4/2/21, Dkt 249 stating in sum and substance that time served during COVID should count at least 1.5 to 2 times actual time.*** [4]

While we are not seeking a downward departure due to the COVID-19 pandemic, we definitely believe that Mr. Cray's incarceration during the pandemic warrants a significant downward variance and he should be credited at least 1.5 days for every day he served from February 2020 to his sentencing.

Indeed, several Courts in this District have reduced sentences based on the pandemic and unduly harsh pretrial conditions of detention. See e.g., *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic). See also, *United States v. Morgan*, 19 Cr. 209 (RMB)(S.D.N.Y. May 5, 2020)(cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Crays*, 19 Cr. 863 (VSB),(S.D.N.Y. May 4, 2020)(reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); and *United States v. Pierson*, 14 Cr. 855 (LTS)(S.D.N.Y. May 4, 2020)(same for defendant detained at MDC).

To be sure, the future in the penal system does not look bright for inmates: cleanliness and social distancing will remain difficult, if not impossible, and while there does appear to be vaccinations becoming available to inmates, it appears in some jurisdictions, inmates are last to receive them.

---

[4] We would note that the Country appears to be in the midst of another COVID-19 wave that is definitely going to impact the prison sentence in a much more sever manner than society at large.

**CONCLUSION**

Mr. Cray is a young man who admittedly and wholeheartedly admits his guilt, sincerely regrets his participation in this conspiracy and stands prepared to be sentenced to a federal felony that will undoubtedly alter his future. We believe that a sentence of **sixty (60) months** is the appropriate sentence in this matter to run concurrent with any undischarged state sentence. Specifically, we bring the Court's attention to the following:

- Mr. Cray will suffer significant collateral consequences;
- Mr. Cray has served over 17 months in jail under severely harsh conditions due to the "gun lockdown" and the COVID-19 pandemic;
- Mr. Cray spent 84 days in the SHU without receiving a ticket;
- Mr. Cray has not seen his family since February 2020;
- Mr. Cray's conduct in this matter is directly related to his community trauma and a drug addiction dating back to when he was 14 years old;
- Mr. Cray has not engaged in any violent, anti-social or narcotic behavior while incarcerated since his arrest;
- Mr. Cray will have a new home to relocate to upon his release;
- Mr. Cray was not a leader or organizer of the organization;
- As noted in the Pretrial Services Report at paragraph 41, Mr. Cray did not "participate in any other acts of violence"; and
- Mr. Cray was a "lookout" and not the shooter in the Attempted Murder that is the subject of this conviction.

Respectfully submitted,

/s/  *Xavier R. Donaldson*

Xavier R. Donaldson
Attorney for Corey Cray

cc:   Assistant U.S. Attorney
       via email